**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| DAVID OSADA, | ) | |
| | ) | |
| Plaintiff, | ) | 1:11-cv-02856 |
| | ) | |
| v. | ) | Judge Harry D. Leinenweber |
| | ) | |
| EXPERIAN INFORMATION | ) | |
| SOLUTIONS, INC. | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFFS' MEMORANDUM IN SUPPORT**
**OF FINAL APPROVAL OF CLASS ACTION SETTLEMENT**

Plaintiffs David Osada and Kimberly Hovanec ("Plaintiffs") individually and as representatives of their respective Classes of similarly situated persons, by Class counsel respectfully submit the following Memorandum in Support of Final Approval of the Class Action Settlement Agreement ("Agreement") which this Court preliminarily approved on August 15, 2013.   Doc. 124.

The Court is advised that subsequent to the entry of the preliminary approval order, 15,977 notices of settlement were sent via U.S. first class mail.[1]   The affidavit of the claims administrator is attached hereto as *Appendix 1*. There were 17 requests for exclusion and one objection submitted by Class members.[2]  *Id*.

The Settlement Agreement provides that class members are only releasing their claims for

---

[1]   The class list contained some duplicates and the correct number of class members is 15,977.

[2]   The one objection is from Anthony Benjamin, but he also excluded himself from the settlement prior to objecting.   As will be addressed below the objection appears to misunderstand the settlement agreement even if Mr. Benjamin is deemed an objector.

statutory damages and explicitly reserve their rights to bring a claim against Experian for actual damages, if any.    The agreement also provides (1) a two-year injunction from using the language that plaintiffs complained about in both of Experian's letters and (2) two years of Protect My ID credit monitoring valued at $6,249,138.00 for the class or $382 value per class member. *Appendix 2 - Settlement Agreement*.

## I.   OVERVIEW OF THE LITIGATION PRECEDING SETTLEMENT

On August 26, 2011, David Osada filed an amended complaint that commenced a class action against defendant Experian Information Solutions, Inc. alleging violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681-1681x.

This action asserted novel claims under a relatively new provision of the FCRA relating to Experian's procedural obligations upon receipt of an identity theft dispute, §1681c-2, which no federal court has ever analyzed in depth.    Specifically, plaintiff alleged Experian's form letter rejecting police reports more than one year old violated the FCRA and Experian's form letter stating an identity theft report does not the meet guidelines of the FCRA was inadequate and thus violated the FCRA.    Because actual damages relating to identity theft greatly vary, plaintiffs have never sought actual damages on behalf of the classes. *See Doc. 31 - Amended Complaint* at p.11. Instead, plaintiffs' class claims were limited to statutory damages, which require plaintiffs to prove that Experian willfully violated the FCRA,[3]  and punitive damages. *See Murray v. GMAC Mortg. Corp.*, 434 F.3d 948, 953 (7th Cir. 2006) (FCRA cases seeking only statutory damages are the very

---

3   The Supreme Court has held in *Safeco Insurance Co. v. Burr*, 551 U.S. 47 (2007) that a violation of the FCRA is willful if it is "reckless." The 7th Circuit reiterated that that a violation of the FCRA is willful when it is based on an "objectively unreasonable" reading of the statute, i.e. a reading posing a high risk of violating the statute. *Van Straaten v. Shell Oil*, 678 F.3d 486, 489 (7th Cir. 2012).

types of cases that Rule 23(b)(3) "was designed for" and questioning the feasibility of a such a class seeking actual damages.)

On March 28, 2012, the Court granted class certification to Class A, which is the One Year class. Class A (One Year letter) is defined as: "All persons from whom (1) Experian received an identity theft report and written request to block information in that person's consumer report alleged to result from the identity theft; and (2) in response to which Experian, between April 28, 2009 and May 18, 2011, sent a letter stating at least in part: 'We are unable to honor your request. Our records indicate that the police report we have on file is more than a year old. Due to your ongoing fraud situation, you will need to submit a new/amended police report, obtained within the past year.'"

A Second Amended Complaint was filed on April 25, 2012 wherein Kimberly Hovanec was named as an additional Named Plaintiff

After additional discovery and extensive briefing, the Court granted class certification to Class B, the Does Not Meet Guideline Class on December 20, 2012. Class B is defined as: "All persons to whom Experian sent a letter between April 28, 2009 and May 18, 2011 stating at least in part: 'We are responding to your request that information in your personal credit report be blocked due to alleged fraud. The identity theft report that you sent us does not meet the guidelines established by the federal Fair Credit Reporting Act; therefore we are unable to honor your request to block information. However, if you provided specific information, we are investigating the information you questioned with the sources."

Subsequently, after briefing by the parties, the Seventh Circuit denied Experian's Rule 23(f) petition as to the December 20, 2012 class certification order for Class B, the Does Not Meet

3

Guideline Class.

The parties then completed extensive discovery regarding plaintiffs' allegations, including contested motion practice regarding the scope of discovery. Among other things, the Parties provided documents, answered multiple sets of interrogatories and requests for the production of documents, Defendant produced various employees for multiple out of town depositions, both Named Plaintiffs were deposed as well as Plaintiffs' expert.

**MEDIATION**

After the close of discovery, the Parties participated in a mediation in front of Mediator Hon. Morton Denlow (Ret.) with JAMS on June 11, 2013. After an all-day mediation, the Parties reached an agreement in principle to settle the litigation, and have since worked to formalize said settlement. Importantly, attorney fees and costs were not negotiated until after the class relief was negotiated. *See Appendix 3 - Declaration of Keith J. Keogh* at para. 26.

Experian has denied and continues to deny each and all of the claims and contentions alleged in the action. Experian also has asserted and continues to assert many defenses thereto and has expressly denied and continues to deny any fault, wrongdoing or liability whatsoever arising out of any of the conduct alleged in the complaint. Nevertheless, in order to avoid the burden and expense of continued litigation, Experian considers it desirable that the action and the claims alleged therein be settled.

Counsel for plaintiffs have reviewed and analyzed the legal and factual issues presented in this action, the information provided by defendants and third parties in discovery, the risks and expense involved in pursuing the litigation to conclusion, the likelihood of recovering damages in excess of those obtained through this settlement, the protracted nature of the litigation and the

likelihood, costs and possible outcome of one or more procedural and substantive appeals. Based on the review and analysis, and after arms-length negotiations with counsel for defendant, plaintiff entered into the Settlement Agreement.

As demonstrated below, the Agreement is ripe for consideration and final approval.

## II.   THE ADMINISTRATION OF THIS CLASS ACTION SETTLEMENT

### A.   The Preliminary Approval Order.

On August 15, 2013, this Court entered an order granting preliminary approval of the Agreement reached between the parties.   Doc. 124.   In the Preliminary Approval Order ("Order"), the Court specifically found that the proposed terms of the settlement satisfied all of the elements of Federal Rule of Civil Procedure 23(a) and 23(b)(3).   The Order further established a procedural framework for the final approval of the settlement.   The Order required the parties to cause notice certified by the Court to be mailed and faxed to the members of the Class, set deadlines and procedures for submission of claims, requests for exclusion, and objections to the settlement, and set November 14, 2013 for the final approval hearing.

### B.   The Sending of Class Notice.

The Court is advised that subsequent to the entry of the preliminary approval order, 15,977 notices of settlement were sent via U.S. first class mail.    The affidavit of the claims administrator is attached hereto as *Appendix 1*.   Out of those notices, 1,160 notices were returned without any forwarding address.[4]   There were 17 requests for exclusion and at most one objection submitted.

---

4 Experian is a national credit reporting agency that provided the best addresses it had for these class members pursuant to the settlement agreement.   Further, the class administrator updated any address information prior to sending notice and re-mailed any notices that were returned with a forwarding address.

### C.     The Value of the Settlement.

This Court has previously considered the terms of the settlement in granting preliminary approval of the Agreement.     Pursuant to the Settlement Agreement, and subject to court approval, the settlement will provide: (1) a two-year injunction from using the language that plaintiffs complained about in both of Experian's letters; (2) two years of Protect My ID credit monitoring valued at $6,249,138.00 for the class or $382 value per class member; and (3) class members retain their right to bring a lawsuit for actual damages, as the release is limited to claims for statutory and punitive damages based on any violation by any of the Released Parties of Section 1681c-2 of the federal Fair Credit Reporting Act and/or any federal or state law counterpart, including, but not limited to, 12 C.F.R. § 1022.3.

Each class member will automatically be entitled to the credit monitoring without the need to submit a claim form.   Further, this case involves Experian's letters in response to requests to block information related to claims of identity theft such that credit monitoring is especially valuable to the class members.

Separate and apart from the above relief, Experian will pay Third Party Settlement Administration Costs and a class representative incentive award to Plaintiffs in an amount to be determined by the Court, but not to exceed $10,000 for each plaintiff.[5]   After the above was negotiated, the parties negotiated attorney fees with the assistance for Judge Denlow.   *Appendix 3* at para 26.   As a result of the fee negotiation, Experian agreed not to object to attorney fees not to exceed $950,000 and costs up to $50,000.00.

---

[5]    David Osada settled his individual claim, which was separately plead, for $10,000 as well.

### D. One Objection Was Received And Seventeen Requests For Exclusion.

Only seventeen class members have elected to be excluded from the Class, and one of the exclusions also objected after he signed the request for exclusion. Copies of Mr. Benjamin's exclusion and objection are attached as *Appendix 4*. The low number of exclusions and the fact that there was only one objection (assuming that objection is even valid since it was submitted after that person signed his request for exclusion) should be viewed as an endorsement of the settlement by the Class.

Further, the lone objector takes issue with the fact that he was not awarded actual damages at the same time noting that he may still bring a claim against Experian. *Appendix* 4.

In his objection, Mr. Benjamin claims that he should be awarded actual damages for damage to "his reputation as a tax and accounting professional was extreme causing me to lose possible thousands of dollars in potential revenues." *Id.* As plaintiffs have consistently argued to this Court and as this Court held when it granted class certification, plaintiffs' class claims were never about whether a request to block was valid. Instead, plaintiffs' claims were based on the language in the form letters and related policies. That is why plaintiffs' class claims were limited to statutory and punitive damages and never sought actual damages on behalf of the class. *See Murray v. GMAC Mortg. Corp.*, 434 F.3d 948, 953 (7th Cir. 2006) (FCRA cases seeking only statutory damages are the very types of cases that Rule 23(b)(3) "was designed for" and questioning the feasibility of a such a class seeking actual damages.) The fact that Mr. Benjamin retains his right to bring a claim for actual damages illustrates his objection is misplaced. It is important to note that Mr. Benjamin's right to bring his actual damage claim remains the same regardless if he is considered an objector or someone whose claim was excluded. In fact a virtual

identical objection was rejected in *Chakejian v. Equifax Info. Services*, 275 F.R.D. 201 (E.D. Penn. 2011)(FCRA class settlement providing only eighteen months of credit monitoring services and injunctive relief to the class). In rejecting such an objection that court held: "The settlement agreement provides that class members retain their rights to bring claims for actual damages, and thus does not deprive Mr. Lichtenstein of the right to seek recovery from Equifax for his substantial financial harm in a separate suit." *Id*. at 212.

The Court is advised that plaintiffs' counsel telephoned Mr. Benjamin to determine if he intended to exclude himself and object as well as whether his objection extended beyond his belief that he was entitled to actual damages. Counsel left a voice-message, but Mr. Benjamin never returned that call. *See* Declaration attached hereto as *Appendix 3*.

It is plaintiffs' position that Mr. Benjamin properly and timely excluded himself from the class settlement such that he does not provide any release to Experian. The fact that he later objected appears to be a void act since he already excluded himself. Such a finding is the best result for Mr. Benjamin as he asserted he does not want credit monitoring. Either way his objection should be rejected as he retains his right to sue for actual damages and based on his assertions of lost business in his letter such a claim is better suited to an individual action.

## III.    THE COURT SHOULD GRANT FINAL APPROVAL TO THE SETTLEMENT.

As this Court already determined that the classes were properly certified, the issue now is whether the Court should grant final approval to the settlement agreement.

### A.    The Standard For Granting Final Approval To The Class Action Settlement.

In *Amchem Productions, Inc. v. Windsor*, 521 U.S. 591 (1997), the United States Supreme Court explained that, before approving a class action settlement, the District Court must first be

satisfied that the elements of Rule 23(a) and 23(b) have been met. *Id.* at 621. This determination was satisfied during the contested class certification briefing and order as well as by the 7th Circuit when it denied defendant's Rule 23(f) petition after briefing.

Once the Court has determined that the requirements of Rule 23(a) and 23(b) have been met, the Court must then determine whether Rule 23(e) has been satisfied by determining whether the settlement is fair, reasonable, and adequate. *General Electric Capital Corporation v. Lease Resolution Corp.*, 128 F.3d 1074, 1082 (7th Cir. 1997).

There is usually an initial presumption of fairness when a proposed class settlement "is the product of arm's length negotiations, sufficient discovery has been taken to allow the parties and the court to act intelligently, and counsel involved are competent and experienced." H. Newberg, A. Conte, Newberg on Class Actions §11.41 (4th ed. 2002); *Goldsmith v. Technology Solutions Co.*, No. 92 C 4374, 1995 WL 17009594, at *3 (N.D. Ill. Oct. 10, 1995); *Boggess v. Hogan*, 410 F. Supp. 433, 438 (N.D. Ill. 1975).

As the Seventh Circuit recognizes, courts generally favor settlements of class actions:

> It is axiomatic that the federal courts look with great favor upon the voluntary resolution of litigation through settlement. In the class action context in particular, "'there is an overriding public interest in favor of settlement.'" Settlement of the complex disputes often involved in class actions minimizes the litigation expense of both parties and also reduces the strain such litigation imposes upon already scarce judicial resources.

*Armstrong v. Bd. of School Directors of the City of Milwaukee*, 616 F. 2d 305, 312-13 (7th Cir.1980)(citations and quotations omitted), *overruled on other grounds by Felzen v. Andreas*, 134 F.3d 873 (7th Cir. 1998).

The Court considers the following six factors in making this determination:

1.      The strength of the plaintiff's case on the merits measured against the terms

of the settlement;

2.    The complexity, length, and expense of continued litigation;

3.    The amount of opposition to the settlement among class members;

4.    The presence of collusion in gaining a settlement;

5.    The stage of the proceedings; and

6.    The amount of discovery completed.

*GE Capital* at 1082 (*citing Donovan v. Estate of Fitzsimmons*, 778 F. 2d 298, 308 (7th Cir. 1985));

*Synfuel Techs., Inc.,* 463 F. 3d at 653; *In re General Motors Corp. Engine Interchange Litig.,* 594

F. 2d 1106, 1132 (7th Cir.1979) (citations omitted); *Isby v. Bayh,* 75 F. 3d 1191, 1199 (7th

Cir.1996). Of these considerations, the first is most important. *Synfuel Techs., Inc.,* 463 F. 3d at

653.    The class action settlement in the present case satisfies each of the factors outlined in *GE*

*Capital*.

### All Of The Factors Weigh In Favor Of Final Approval

A.    **The Injunction And $382 Value Of Credit Monitoring Provide Significant Benefits To The Settlement Class And The Release Is Narrow.**

Plaintiffs alleged Experian's form letter rejecting police reports more than one year old

violated the FCRA and Experian's form letter stating an identity theft report does not the meet

guidelines of the FCRA was inadequate and thus violated the FCRA.    Once again, because actual

damages relating to identity theft greatly vary, plaintiffs have never sought actual damages on

behalf of the classes. *See Doc. 31 - Amended Complaint* at p.11.    Instead, plaintiffs' class claims

were limited to statutory and punitive damages where statutory damages require plaintiffs' to prove

that Experian willfully violated the FCRA.[6] *See Murray supra.*, at 953 (7th Cir. 2006) (FCRA cases seeking only statutory damages are the very types of cases that Rule 23(b)(3) "was designed for" and questioning the feasibility of a such a class seeking actual damages.)

Even if plaintiffs 1) proved that Experian violated the FCRA and 2) proved that Experian acted willfully, statutory damages would be in a range of $100-$1,000. At the low end of statutory damages, Experian would be liable for just $1,597,700 in statutory damages. While plaintiffs submit that they have a strong claim, plaintiffs recognize that defendant has defenses to the claims including that there are no district or appellate court rulings as to the merits of plaintiffs' claims, which Experian has argued defeats any claim for willfulness even assuming a finding of liability.

In any event, the value of the settlement is $382.00 per class member for a total value of $6,249,138.00 plus a two-year injunction from using the language that plaintiffs complained provides significant benefits to the class. In addition, there is no need for a claim form. This settlement is comparable or exceeds similar FCRA class settlements.

For example, in *Hillis v. Equifax Consumer Serivces*, 2007 U.S. Dist. LEXIS 48278 (N.D. Ga. 2007), the Court approved class settlement providing only three to six months of credit monitoring services and injunctive relief to the class and awarding $4,000,000 in fees and expenses in a class settlement. In examining the value of the settlement, the court found:

> The Court finds that this is not a "coupon" settlement. A coupon settlement implies that Class Members will receive a coupon that will entitle Class Members to a discount on some future purchase. *See, e.g., New York v. Nintendo of Am., Inc., 775 F. Supp. 676, 679 (S.D.N.Y. 1991)* (class received coupons for $ 5 off the future purchase of Nintendo video game cartridges). Here, Settlement Class Members are

---

6   The Supreme Court has held in *Safeco Insurance Co. v. Burr*, 551 U.S. 47 (2007) that a violation of the FCRA is willful if it is "reckless." The 7th Circuit reiterated that that a violation of the FCRA is willful when it is based on an "objectively unreasonable" reading of the statute, i.e. a reading posing a high risk of violating the statute. *Van Straaten v. Shell Oil*, 678 F.3d 486, 489 (7th Cir. 2012).

not required to spend any money in order to avail themselves of the in-kind relief. The in-kind relief is a free Offering that does not require any expenditure by Settlement Class Members. There are no strings attached to the receipt of this in-kind relief. *Hillis* at * 31.

In *Chakejian v. Equifax Info. Services*, 275 F.R.D. 201 (E.D. Penn. 2011) the court

approved the class settlement providing only eighteen months of credit monitoring services and

injunctive relief to the class as well as awarded $1,075,000 in fees and expenses. It held:

> "Although Congress did not define the term 'coupon' in the statute, courts have generally considered a coupon settlement to be one that provides benefits to class members in the form of a discount towards the future purchase of a product or service offered by the defendant." *Radosti v. Envision Emi, LLC, 717 F. Supp. 2d 37, 55 (D.D.C. 2010)*. I do not find this case to present a coupon settlement, as class members do not have to purchase a product in order to obtain a benefit. *See Synfuel Techs., Inc. v. DHL Express (USA), Inc., 463 F.3d 646, 654 (7th Cir. 2006)* ("[P]re-paid envelopes are not identical to coupons, since they represent an entire product, not just a discount on a proposed purchase.")." *Chakejian* at 215.

In *Gillespie v. Equifax Information Services*, 2009 U.S. Dist. LEXIS 131242 (N.D. Ill.

2009)(Kennelly, J.), the court approved the class settlement providing only six months of credit

monitoring services and injunctive relief to the class and awarded $913,000 in fees and expenses.

In doing so, the court held:

> "The claims presented issues of first impression both with respect to class and merits issues. Such novel and complex questions required competent counsel with a background in class and consumer litigation. Plaintiffs Counsel worked on a contingent basis for a period of close to five years and given the time expended were precluded in working on other matters. The expenditure of this time and expense resulted in a fair and reasonable settlement." *Gillespie* at *14.

> Plaintiffs would recover $ 0 if a jury determined that Equifax acted in good faith or non-willfully. A jury could find that Equifax acted willfully and awarded statutory damages in the range of $ 100 to $ 1000. Even if Plaintiffs' obtained a jury award, Equifax would seek to file post-trial motions and ultimately appeal any verdict to the Seventh Circuit. Recent appellate decisions have found an absence of "willfulness" where a defendant's reading of the FCRA is implicated. *See Safeco Ins. Co. v. Burr*, 551 U.S. 47, 127 S. Ct. 2201, 167 L. Ed. 2d 1045 (2007) and *Murray v. New Cingular Wireless Services, Inc.*, 523 F.3d 719, 726 (7th Cir.

2008). In light of the questions of law and fact present in this litigation as discussed above, the value of the proposed settlement outweighs the possibility that a cash award of statutory damages might be obtained in the future. *Gillespie* at \*6-7

Likewise the court in *Barel v. Bank of America*, 255 F.R.D. 393 (E.D. Penn. 2009), approved settlement providing only four months of credit monitoring services and injunctive relief to the class and awarded $390,000 in fees and expenses.

In addition, the settlement is warranted by the complexity, length and expense of continued litigation, satisfying the second *GE Capital* factor. As Judge Kennelly held in *Gillespie* even if plaintiff defeated summary judgment and prevailed at trial, Experian could still have appealed. A settlement now benefits the class, not only because of the relief provided, but because it notified the class of a claim that many of them were not aware for which they still can sue for any actual damages.

The settlement satisfies the third *GE Capital* factor because only 17 Class member have excluded themselves from the settlement and at most one class member has objected to the settlement.

**b.      The Settlement Resulted From Extensive Arms-Length Negotiations**

As a leading treatise on class action jurisprudence explains, "…decisions indicate that the courts respect the integrity of counsel and presume the absence of fraud or collusion in negotiating the settlement, unless evidence to the contrary is offered." Newberg, §11.51. *See also*, Section IV(1)(A), *supra* (there is an initial presumption of fairness when a settlement has been negotiated at arms-length by experienced counsel). The requirement that a settlement be fair is designed to protect against collusion among the parties. *Mars Steel Corp. v. Cont'l Ill. Nat. Bank and Trust Co. of Chicago*, 834 F. 2d 677, 684 (7th Cir. 1987) (approved settlement upon finding of no

13

"hanky-panky" in negotiations). There usually is an initial presumption that a proposed settlement is fair and reasonable when it was the result of arms-length negotiations. Newberg, §11.42.

Settlement in this case was reached after two rounds of class certification briefing where plaintiffs were ultimately successful, a Rule 23(f) petition, contested discovery motions, and after the close of discovery. Among other things, the Parties provided documents, answered multiple sets of interrogatories and requests for the production of documents, Defendant produced various employees for multiple out of town depositions, including two separate depositions of Experian in Texas, a deposition of an Experian employee in California and plaintiffs' expert[7] in Washington D.C. Further, both Named Plaintiffs were deposed as well.

The significant economic benefit to the Settlement Class, coupled with the narrow release, demonstrate that the settlement is more than fair, reasonable and adequate.

Given the stage of proceedings, the investigation and discovery completed, the proposed settlement satisfies the fifth and sixth *GE Capital* factors.

**The Notice To Class Members Is Adequate**

Under Federal Rule of Civil Procedure 23(c)(2), class members are entitled to notice of any proposed settlement and an opportunity to object or opt out before it is finally approved by the Court. Manual for Complex Litig. (Fourth) § 21.31 (2004). Notice is adequate if it is "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 174 (1974), *quoting, Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306

---

7   Plaintiffs also retained database experts who discussed retrieval of class members' identification with Experian's IT representatives.

(1950).

The Notice sent to class members was clear and straightforward, providing putative class members with enough information to evaluate whether to participate in the Settlement, as well as directions on how to seek further information. *Appendix 2* at Exhibit B. The Notice contained all of the information required by Rule 23, such as the nature of the action; the class definition; summary of the class claims and defenses; the amount paid for a claim; the potential class representative fee and attorneys' fees and costs; ability to enter an appearance; exclusion rights; objection rights and binding effect of a class judgment on members under Rule 23.

The Claims Administrator mailed, by first class mail, the Class Notice to persons in the Settlement Class for whom potential mailing addresses were located through the exercise of reasonable diligence. *Appendix 1*.

The notice scheme is consistent with the due process requirements incorporated in Rule 23(c)(2)(B). Rule 23's advisory committee note states that the "mandatory notice pursuant to subdivision (c)(2) . . . is designed to fulfill requirements of due process to which the class action procedure is of course subject." Fed. R. Civ. P. 23(d)(2) advisory committee's note. (*citing*, *Mullane*, 339 U.S. 306 (additional citations omitted).

## IV.    **FINAL APPROVAL ORDER**

The parties have agreed to the Final Approval Order attached as *Exhibit C* to the Settlement Agreement that is attached as *Appendix 2*. A copy of the proposed final approval order is also attached hereto as *Appendix 5* for the convenience of the Court. The release that is incorporated into the Final Approval Order is narrowly tailored to claims and excludes any claims for actual damages.

## V.     **THE ATTORNEY'S FEES AND COSTS ARE REASONABLE.**

Pursuant to the Agreement, Class Counsel requests approval of payment of attorney's fees and costs in the amount of $950,000.00, which equals approximately 15% of the $6,249,138.00 value of the settlement.

Plaintiff's counsel includes experienced class action attorneys, all of whom contributed their skills and expended their resources in a coordinated effort that resulted in the settlement of this matter.     The Seventh Circuit has specifically authorized the district courts to award attorney's fees using the percentage of fund method.     *In re Synthroid Mktg. Litig.*, 264 F. 3d 712 (7th Cir. 2001).

Attorneys who achieve a benefit for class members in the form of a "common fund" are entitled to be compensated for their services from that settlement fund. *See Boeing Co. v. Van Gemert,* 444 U.S. 472, 478 (1980) ("a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole"); *see also Gaskill v. Gordon,* 160 F. 3d 361, 362 (7th Cir. 1998); *Florin v. Nationsbank, N.A.,* 34 F. 3d 560, 566 (7th Cir. 1994); *In re Cont'l Ill. Sec. Litig.,* 962 F. 2d 566, 572 (7th Cir. 1992) ("*Cont'l I*"); *In re Cont'l Ill. Sec. Litig.,* 985 F. 2d 867, 868 (7th Cir. 1993) ("*Cont'l II*"); *Kendrick v. Atcor, Inc.,* 1988 U.S. Dist. LEXIS 8389 (N.D. Ill. 1988).

The 7th Circuit has explicitly approved of fee awards based on a percentage of the total value of credit monitoring services provided in a class action settlement under the FCRA.     *In re Trans Union Corp. Privacy Litigation*, 629 F.3d 741 (7th Cir. 2011), the 7th Circuit considered a settlement that provided credit monitoring services to the class in addition to approximately $30 in cash to each class member who was expected to claim in. *Id* at 745-46.     The District Court had

awarded attorney's fees based on a percentage of the total value of the settlement to the class members, but whereas the District Court awarded fees for the cash portion of the settlement at 15% of its value, it awarded fees for the credit monitoring portion of the settlement at only 5% of their value. *Id*. at 746. The 7th Circuit approved of the settlement but ruled that the reduction of the percentage used to calculate attorney's fees for the credit monitoring portion of the settlement from 15% to 5% was arbitrary and improper and therefore held that attorney's fees for the credit monitoring portion of the class recovery should be awarded at the same percentage applicable to the value of the cash portion of the settlement (15%). *Id*. at 746-48.

In *Taubenfeld v. Aon Corp.,*415 F. 3d 597 (7th Cir. 2005), the Seventh Circuit provided guidance for the award of attorneys' fees in a class action:

> [W]hen deciding on appropriate fee levels in common-fund cases, courts must do their best to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time." Although it is impossible to know *ex post* exactly what terms would have resulted from arm's-length bargaining *ex ante,* courts must do their best to recreate the market by considering factors such as actual fee contracts that were privately negotiated for similar litigation, information from other cases, and data from class-counsel auctions. *Id.* at 599 (citation omitted). In affirming an award of fees equaling 30% of the $7.25 million settlement fund plus expenses, the *Aon* court considered, among other things, the following factors: (1) "awards made by courts in other class actions" which "amount[ed] to 30-39% of the settlement fund"; (2) "the quality of legal services rendered"; and (3) "the contingent nature of the case.

*Id.* at 600. In considering a fee request, the court must do its "best to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time." *In re Synthroid Mktg. Litig.,* 264 F.3d at 718. As discussed below, 15% of the value Settlement Fund, which excludes the significant benefit of the two year injunction, is the most appropriate method to "recreate the market" given the nature and scope of the Litigation, the time spent and expenses incurred in its prosecution and the substantial result achieved for the

Class.

"'[T]he approach favored in the Seventh Circuit is to compute attorney's fees as a percentage of the benefit conferred on the class,' particularly where that percentage of the benefit approach replicates the market." *Cooper v. IBM Pers. Pension Plan,* No. 99-829, 2005 WL 1981501, at *3 (S.D. Ill. Aug. 16, 2005). The percentage method is consistent with, and is intended to mirror, the private marketplace for negotiated contingent fee arrangements. *See Kirchoff v. Flynn,* 786 F. 2d 320, 324 (7th Cir. 1986) ("When the 'prevailing' method of compensating lawyers for 'similar services' is the contingent fee, then the contingent fee *is* the 'market rate.'")(emphasis in original).

In the marketplace, the "contingent fee uses private incentives rather than careful monitoring to align the interests of lawyer and client. The lawyer gains only to the extent his client gains." *Kirchoff,* 786 F. 2d at 325; *see also In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions,* 148 F. 3d 283, 333 (3d Cir. 1998). If this case were an individual case, the customary fee arrangement would be contingent, on the percentage basis, and in the range of 331/3% to 40% of the recovery. *See Kirchoff* at 323 (observing that "40% is the customary fee in tort litigation" and noting, with approval, contract providing for one-third contingent fee if litigation settled prior to trial); *Retsky Family Limited Partnership v. Price Waterhouse, LLP,* 2001 WL 1568856 at *4 (N.D. Ill 2001) (recognizing that a customary contingent fee is "between 33 1/3% and 40%" and awarding class counsel the requested one-third of the common fund); *Phemister v. Harcourt Brace Jovanovich, Inc.,* No. 77 C 39, 1984 U.S. Dist. LEXIS 23595, at *40–41 (N.D. Ill. Sept. 14, 1984) ("Contingent fee arrangements in non-class action damage lawsuits use the simple method of paying the attorney a percentage of what is recovered for the

client. The more the recovery, the more the fee. The percentages agreed upon vary, with one-third being particularly common.").

"The Seventh Circuit strongly endorsed the percentage method of computing appropriate fee awards in class action common fund cases." *See Goldsmith v. Tech. Solutions Co.,* 1995 U.S. Dist. LEXIS 15093, *24 (N.D. Ill. 1995) (other citations omitted) (approving 33.33% fee award), *citing Cont'l Ill. II,* 985 F. 2d 867.   This District has also recognized that a fee award of "33 1/3% is in fact in line with that which has, in previous cases, been approved," and "[t]hirty three percent appears to be in line with what attorneys are able to command on the open market in arm's length negotiations with their clients." *Id.* at 26–27. Notably, the Northern District has recognized the appropriateness of a fee of nearly 1/3 of the common fund in complex litigation and the historic approval of such fees in the Seventh Circuit. See *also Family L.P. v. Price Waterhouse LLP*, 2001 WL 1568856 (N.D. Ill. 2001) (33 1/3 % awarded); *In re Lithotripsy Antitrust Litig.,* 2000 U.S.Dist. LEXIS 8143, **6-7 (N.D. Ill. June 12, 2000) ("33.3% of the fund plus expenses is well within the generally accepted range of the attorneys' fee awards in class-action anti-trust lawsuits."); *In re Spyglass, Inc. Sec. Litig.,* No. 99-c-5 12 (N.D. Ill. March 24, 2000) and *In re Spyglass, Inc. Sec. Litig.,* No. 99-cv-0512 (N.D. Ill. May 31, 2000) (33% fee award approved); *Rehm v. Eagel Fin. Corp.*, 1998 U.S. Dist. LEXIS 20015 (N.D. Ill. Dec. 8, 1998) (approving 33.3% fee request), *aff'd Rehm v. EagelFin. Corp.,* No. 96-2455 (N.D. Ill. Dec. 8, 1998) ("the 7th Circuit Court of Appeals, as well as the majority of other circuit courts have approved the use of the percentage of the fund method to award attorneys' fees in class action/common fund cases"); *Taubenfeld*, 415 F.3d at 598 (7th Cir. 2005) (affirming fee award of 33.3%). *Gaskill*, 942 F. Supp. 382, *aff'd* 160 F. 3d 361 (7th Cir. 1998) (38% awarded); *In Re Ameriquest Mortgage Co. Mortgage Lending Practices*

*Litigation*, Case No. 05 CV 07097 (N.D. Ill. 2010) (Awarded $7.33 million for attorney fees, which is 33% of the common fund); *See also Appendix 6*, Chart of Securities Class Actions awarding fees of 33.3% of the Settlement Fund.[8]  The requested fee of less than 15% of the value of the fund is much less than the above cases.

While many of courts in this Circuit[9]  have questioned the use of the lodestar analysis either for determining the proper amount of fees or as a "cross-check," the attorneys' fee award that Class Counsel seeks is equally reasonable under the lodestar method. *See Schulte*, 805 F. Supp.2d at 598; *see also In re AT&T Mobility Wireless Data Servs. Sales Tax Litig.*, 792 F.Supp.2d 1028, 1037-38 (N.D. Ill. 2011) ("It is not a requisite of reasonable attorneys' fees that Class Counsel engage in laborious litigation over many years. Instead, it is a question of what the Class Members and Counsel would have agreed to *ex ante* in arm's length negotiation."). As such, should the Court desire to perform such analysis, the lodestar approach would certainly confirm the reasonableness of the fees and award requested here.

---

8   In consumer protection class actions such as claims under the TCPA, courts in this District routinely award 33% of the fund.  *Saf-T-Gard v Seiko*, 09 C 776 (N.D. *Saf-T-Gard v Seiko*, 09 C 776 (N.D. Ill. 2011) (Judge Bucklo) (Awarding 33% of the common fund); *Hinman v. M and M Rental Center* Inc., 06-cv-01156, Doc. 225(N.D. Ill. 2008) (Awarded 33% of the common fund plus costs); *CE Design, Ltd. v. Cy's Crabhouse*, 07 C 5456 (N.D. Ill.) (Kennelly, J.) (N.D. Ill. Sept. 22, 2010) (Awarded 33% of the common fund plus costs. Doc. 373); *Holtzman v. CCH*, 07 C 7033 (N.D. Ill. Sept. 30, 2009) (Nordberg, J.) (Awarded 33% of the common fund plus costs. Doc. 33);*CE Design, Ltd. v. Exterior Systems, Inc.*, 07 C 66 (N.D. Ill. Dec. 6, 2007) (Darrah, J.) (Awarded 33% of the common fund plus costs. Doc. 32-2); *Locklear Electric, Inc. v. Norma L. Lay*, 09 C 0531 (S.D. Ill.) (Reagan, J.) (Awarded 33% of the common fund plus costs. Doc. 67) *Accounting Outsourcing, LLC. v Verizon Wireless*,   2007 U.S. Dist. LEXIS 97153 (M.D. La. 2007) (Awarded $2,314, 328, which is in excess of 35% of the common fund, plus costs); *Nicholson v Hooters of Augusta, Inc.*, 95-RCCV-616 (Richmond County, Ga. April 25, 2001) (Awarded $3,931,035.62, which was 33% of the common fund plus costs).

9   In the Seventh Circuit, the use of a lodestar cross-check is not required. *Williams*, 658 F.3d at 636. ("The use of a lodestar cross-check in a common fund case is unnecessary, arbitrary, and potentially counterproductive."); *see also Cook v. Niedert*, 142 F.3d 1004, 1013 (7th Cir. 1998) ("[W]e have never ordered the district judge to ensure that the lodestar result mimics that of the percentage approach."); *Silverman v. Motorola, Inc.*, No. 07 C 4507, 2012 WL 1597388, at *4 (N.D. Ill. May 7, 2012) (recognizing that "there are advantages to utilizing the percentage method in common fund cases because of its relative simplicity of administration and holding that it "is unnecessary to resort to a lodestar calculation to reinforce the same conclusion").

To determine the reasonableness of attorneys' fees under the lodestar method, the first step is to "multiply[] a reasonable hourly rate by the number of hours reasonably expended." *Gastineau v. Wright,* 592 F.3d 747, 748 (7th Cir. 2010). A reasonable hourly rate should be in line with the prevailing rate in the "community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Jeffboat, LLC v. Director, Office of Workers' Comp. Programs*, 553 F.3d 487, 489 (7th Cir. 2009); *see also Denius v. Dunlap*, 330 F.3d 919, 930 (7th Cir. 2003) (finding the attorney's actual billing rate for comparable work to be presumptively appropriate). Once calculated, the Court must adjust that total by the use of a multiplier, which accounts for the risk of loss Class Counsel faced when embarking on the litigation. *In re Trans Union Corp. Privacy Litig.*, 629 F.3d at 746.

The time spent, experience and rates of plaintiffs' attorneys are set forth in the chart below and in the declaration of counsel.

| Staff | Role | Years in Practice | Time | Rate | Total | |
|---|---|---|---|---|---|---|
| Keith J. Keogh | Partner | 14 | 343 | $475 | $ 162,925.00 | |
| Timothy J. Sostrin | Associate | 7 | 548.6 | $375 | $ 205,725.00 | |
| Katherine Bowen | Associate | 1 | 17.8 | $270 | $ 4,806.00 | |
| Ainat Margalit | Associate | 10 | 37.9 | $400 | $ 15,160.00 | |
| Matthew Seckel | Paralegal | 6 | 40.7 | $150 | $ 6,105.00 | |
| Kelley Scott | Paralegal | 6 | 1.2 | $150 | $ 180.00 | |
| Alan Williams | Paralegal | 1 | 6 | $125 | $ 750.00 | |
| | | | | | $ 395,651.00 | |
| | | | | | | |
| | | | | | | |

*See Appendix 3*. Declaration of Keith J. Keogh.     In addition, plaintiffs' counsel has submitted the declaration of James Shedden a Chicago class action attorney who has submitted his declaration in support of the above rates.     *Appendix 7*.

Both the market based percentage approach and the lodestar cross-check support the reasonableness of this request. In addition to fronting the above fees, class counsel has also paid $26,987.93 in expenses. *Appendix 3* at 22.

The requested multiplier of 2.4 is reasonable and fair in light of the degree of risk. *See e.g.*, *Cont'l Ill. I*, 926 F.2d at 569 (reversible error found where district court refused to award a risk multiplier); *Florin*, 34 F. 3d at 565 (risk multiplier mandated in common fund cases where counsel had "no sure source of compensation."). Awarding fees above the lodestar is appropriate where the class members receive a significant recovery, and the "purpose of the statute is actually being fulfilled." *Seidat v. Allied Interstate, Inc.,* No 03 C 975 (N.D. Ill.) (Final Approval Order, Feb. 24, 2004) (Guzman, J.).

In this case, plaintiffs advanced a novel theory under the FCRA and undertook substantial risk in not only failing to prove liability, but also willfulness even assuming liability was found. In *Taubenfeld v. Aon Corp*, 415 F.3d 597, 600 (7th Circuit 2005), this Court was affirmed in awarding a fee of 30% of common fund over objection because this Court found that class counsel had taken on "a significant degree of risk of nonpayment with the case" and faced significant "legal hurdles." In addition, this Court had considered similar awards in analogous class actions as "indicative of a rational relationship between the record in this similar case and the fees awarded by the district court." *Id*.

Other courts have awarded fees that resulted in much higher multiples of the lodestar. *See Roberts v. Texaco, Inc.*, 979 F. Supp. 185 (S.D. N.Y. 1997) (applying multiplier of 5.5) *Willson v. New York Life Insurance Co.*, 1995 N.Y. Misc. LEXIS 652, *94 (S.Ct. 1995) (awarding fee that resulted in multiple of 4.6 times the lodestar), *citing Weiss v. Mercedes-Benz of No. American,*

*Inc.*, 899 F. Supp. 1297 (D. N.J., 1995) (awarding fee that resulted in multiple of 9.3 times the lodestar); *In re RJR Nabisco, Inc.*, Sec.Litig., [1992 Transfer Binder] Fed.Sec.L.Rep. (CCH) P 96,984, at 94,267 (S.D. N.Y. 1992) (multiplier of 6); *Cosgrove v. Sullivan*, 759 F. Supp. 166 (S.D. N.Y. 1991) (multiplier of 8.74); *Glendora Community Redevelopment Agency v. Demeter*, 155 Cal. App. 3d 465, 202 Cal. Rptr. 389 (1984) (fee award was 12 times the lodestar); *Goldenberg v. Marriott PLP Corp.*, 33 F. Supp.2d 434, 439, n. 6 (D. Md. 1998) (noting that multipliers of 3 - 4.5 have been common over the years).

Once again, attorney fees and expenses in this case were negotiated after the class settlement was resolved and with the assistance of Judge Denlow. *See Appendix 3* at 26.   This Court in *Henry v. Sears, Roebuck & Company*, 1999 U.S. Dist. LEXIS 13831 (N.D. Ill. 1999)(Leinenweber, J.) awarded $15,000,000 in fees over objections in a coupon settlement where lodestar calculation was only $3.7 million when there was no evidence of collusion. This Court held:

> if the two figures [settlement amount and attorney's fees] are negotiated simultaneously an obvious conflict of interest exists between the plaintiff's counsel and his client, here the class. The more the attorneys get the less the class gets and vice versa. Attorneys obviously want as much as they can get. The defendant doesn't really care, his consideration is the bottom line.   However, where the class settlement is concluded before the attorneys' fees issue is tackled, the parties have a far different consideration: what will the court approve if the parties fail to agree and it is left to the court to decide. Each side must make an independent evaluation, and the negotiations will proceed from there. Thus the amount arrived at is based on the adversary process and any conflict between class counsel and the class is greatly discounted. The defendant has an incentive to pay as few dollars as possible for plaintiff's attorneys' fees.

*3-4.

In light of the work performed in this matter, and the actual time incurred by counsel, Class Counsel's request for a multiplier of 2.4 is reasonable, particularly as it does not account for time that will be incurred by Class Counsel in insuring that the settlement is implemented according to

its terms, and responding to additional inquiries from Class members. Accordingly, Class Counsel believes the amount requested is reasonable and requests approval of this amount by the Court. Further, the agreement provides for expenses up to $50,000, yet counsels expenses are only $26, 987.93 such that Experian will retain the difference.[10]

**No Class Member Objected to the Attorneys' Fees and Expenses Requested**

As noted above, out of almost 16,000 Class Members, no objections to counsel fees and costs were filed. *See Appendix 4* (sole objection was to lack of actual damages.) Based on the foregoing, the Court should grant Class Plaintiff's request for attorneys' fees in the amount of $950,000.00 and expenses in the amount $26, 987.93

## VI. THE COURT SHOULD ALSO APPROVE THE REQUESTED SERVICE AWARD

Class Counsel requests that the Court approve service awards in the amount of $10,000 for each named plaintiff, which is paid separate from the amount made available to the class.

The Notice informed the Class of this request and at no objections to proposed service awards were received. In fact, the lone objector only complained about the actual damage portion of Mr. Osada's separately plead individual claim, which the parties disclosed in the notice. Courts have approved service awards on the basis that Named Plaintiffs in class actions take risks and perform services for the benefit of the Class. *See* Albert Conte and Herbert B. Newberg, 4 NEWBERG ON CLASS ACTIONS, §11.38 (4th ed.). Indeed, "since without the named plaintiff there can be no class action, such compensation as may be necessary to induce him to participate in the suit could be thought the equivalent of the lawyers' non-legal but essential case specific

---

10  Because Fees and Expenses were negotiated after and apart from the class relief, any increase or decrease in either only benefits Experian and does not benefit the class.

expenses." *In re Cont'l I*, 962 F. 2d 571. Since *In re Cont'l I*, service awards for named plaintiffs in class actions have been regularly granted and upheld in this Circuit. *See Cook,* 142 F. 3d 1016 (7th Cir. 1998); *Saf-T-Gard v Seiko,* 09 C 776 (N.D. *Saf-T-Gard v Seiko,* 09 C 776 (N.D. Ill. 2011) (Judge Bucklo) ($12,500 to named plaintiff in a class); *In Re Ameriquest Mortgage Co.* at ¶12. (Awarded service payments of $7,500 to each of the 87 named plaintiffs.); *Gibson & Company Insurance Brokers, Inc. v. QFA Royalties LLC.*, 06-cv-05849-PSG-PLA Document 212 (C.D. Ca. 2009) ($15,000 to the named plaintiff for service payment in TCPA class settlement)*; Nicholson v Hooters of Augusta, Inc.*, 95-RCCV-616 (Richmond County, Ga. April 25, 2001) ($15,000 to the named plaintiff in a class action for service payment).

In fact the Seventh Circuit was recently critical of a $7,500.00 incentive award in a TCPA case as being too small.    In *Ira Holtzman, C.P.A., & Associates Ltd. v Turza,* 11-3188 (7th Cir. August 26, 2013) the court described the award as a disincentive award. p.14.

Plaintiffs invested time and energy working with counsel, responded to substantial discovery, were deposed, and carried to their potential detriment and the benefit of the Class the substantial risk of nonrecovery. For their willingness to continue to represent the Class in such circumstances and for its ultimately fruitful efforts on behalf of the Class, plaintiffs have earned the requested service award.

Finally, any reduction in the service award would not benefit the class as defendant is paying the incentive fee in addition to any payment to the class members and if it is reduced defendant would retain the difference.

**VII.    CONCLUSION**

For all the reasons set forth above, Plaintiffs individually, and as representative of the

Classes, by Class Counsel, request that this Honorable Court grant final approval of the Agreement

and enter the proposed final approval order attached hereto as *Appendix 5*.

Respectfully submitted,

/s/ Keith J. Keogh

Keith J. Keogh
Timothy Sostrin
Katherine Bowen
KEOGH LAW, LTD.
55 W. Monroe, Suite 3390
Chicago, IL 60603
(312) 726-1092/(312) 726-1093 (fax)
Keith@Keoghlaw.com